IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| KAREN CRISS, | } | |
| | } | |
| Plaintiff, | } | |
| | } | CIVIL ACTION NO. |
| v. | } | 2:13-cv-0685-WMA |
| | } | |
| UNION SECURITY INSURANCE | } | |
| COMPANY, | } | |
| | } | |
| Defendant. | } | |

## MEMORANDUM OPINION AND ORDER

### Prologue

This court devoutly wishes that the Supreme Court of the United States had not blindly stumbled off on the wrong foot and in the wrong direction when it handed down *Firestone Tire & Rubber Co. v. Bruch*, 49 U.S. 101 (1989), the case in which it invented a strange quasi-administrative regime for court review of denials of ERISA benefits claims. It inexplicably substituted a procedure borrowed from administrative law for the clear congressional mandate that the filing of a "civil action" (a simple, straight-forward, garden-variety suit for breach of contract) is the only means for challenging such denial decisions. In the *amicus curiae* brief filed by the Solicitor General in *Bruch*, he did his best to keep the Supreme Court from wandering off track and ignoring Congress. The Solicitor General, who was representing both Congress and the persons whom Congress intended to benefit from ERISA, failed to talk the Supreme Court out of its misguided step,

a misstep that has led to a series of further judicial glosses, distillations, penumbras, and emanations, eventuating in the sad state of affairs now faced by ERISA claimants and by the courts who have to deal with ERISA benefits claims.

If Congress itself had enacted the weird scheme created by the *Bruch* court out of whole cloth, ERISA would have been promptly and successfully attacked for its patent unconstitutionality as a violation of "due process". A quick application of the universally recognized legal maxim, *nemo judex in causa sua*, would have kept any such statute off the statute books. Chief Justice Sir Edward Coke in *Dr. Bonham's Case*, 8 Co. Rep. 107a, 77 Eng. Rep. 638 (C.P. 1610), carved in granite for all time this fundamental jurisprudential principle when he said, using the vernacular: "No man should be a judge in his own case."

The justices of the Supreme Court, including some who decided *Bruch*, routinely recuse themselves when there is even the slightest hint of any possible self-interest by the recusing justice. And yet, today, clearly conflicted ERISA plan administrators and insurers, when granted by the plan document that they drafted full discretion to interpret their plans and to decide the ultimate issue of entitlement, are routinely allowed, even required, to rule on their own cases. Not surprisingly, this court has not found a single case in which an insurance company has recused itself in an ERISA case under the rule of *nemo judex in causa sua*. There is no

scheme remotely like the one created by *Bruch* in the annals of Anglo-American jurisprudence.  Chief Justice Coke is uncomfortable in his crypt.

While in the above three paragraphs this court has been indulging in wishful thinking, the court is now brought back to earth by the knowledge that it cannot alter or ignore the actual state of ERISA jurisprudence, as it has evolved from *Bruch*. Especially, this court cannot alter or ignore what the Eleventh Circuit has done to produce its own *sui generis* brand of fruit from the poisoned tree.

In *Brown v. Blue Cross & Blue Shield of Alabama, Inc.*, 898 F.2d 556 (1990), the Eleventh Circuit acknowledged the binding effect of the *Bruch*-created "arbitrary and capricious" standard for reviewing the decisions of ERISA decision-makers who have granted themselves *Bruch* discretion.  But, in *Brown*, the Eleventh Circuit also recognized that the *Bruch* regime could lead to the Frankenstein that it has come to be.  The Eleventh Circuit issued its warning to itself and to others, in the following remarkable, but unmistakable language:

> Because we have restated the standard as arbitrary and capricious, the temptation exists to consult precedent regarding the use of that standard to review administrative agency decisions.  *See e.g., Jett,* 890 F.2d at 1141-42 (Johnson. J., concurring and dissenting) (citing and quoting from *Motor Vehicle Mfrs. Ass'n v. State Farm Auto Ins. Co.*, 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)).  In some instances an overlap is evident.  *Compare, e.g., id.* (extracting duty to

> investigate from *Motor Vehicle Mfrs. Ass'n) with Jader*,
> 723 F.Supp. at 1342-43; *Slover*, 714 F.Supp. at 832-33;
> *Teeter v. Supplemental Pension Plan*, 705 F.Supp. 1089,
> 1095 (E.D. Pa.1989) (fiduciary has affirmative duty to
> gather information bearing on beneficiary's claim that is
> reasonably obtainable).  We express caution, however, at
> wholesale importation of administrative agency concepts
> into the review of ERISA fiduciary decisions.  Use of the
> administrative agency analogy may, ironically, give too
> much deference to ERISA fiduciaries.  Decisions in the
> ERISA context involve the interpretation of contractual
> entitlements; they "are not discretionary in the sense,
> familiar from administrative law, of decisions that make
> policy under a broad grant of delegated powers." *Van
> Boxel*, 836 F.2d at 1050.  Moreover, the individuals who
> occupy the position of ERISA fiduciaries are less well-
> insulated from outside pressures than are decisionmakers
> at government agencies.  *See Maggard*, 671 F.2d at 571.
> We therefore concentrate on the common law trust
> principles to evaluate the application of the arbitrary
> and capricious standard.  Of course, the common law we
> consider includes the cases decided under the Labor
> Management Relations Act.  *See, e.g., Sharron v.
> Amalgamated Ins. Agency Servs., Inc.*, 704 F.2d 562 (11th
> Cir.1983) (decided under LMRA, not ERISA, but
> subsequently applied to ERISA situations).

*Brown*, 898 F.2d at 564 n.7.  This ominous footnote did not slow down the Eleventh Circuit in its march toward achieving the reputation as the circuit court of appeals least likely to rule against a plan administrator or an insurer.

In response to *Bruch*, an increasing number of states have adopted a statute or insurance industry rule that precludes the inclusion of the so-called "discretionary clause" in a disability insurance policy.  These states have wisely slipped the embrace of *Bruch* and have accomplished in their states what Congress intended, namely, trials *de novo* for beneficiaries after they have been

denied and unsuccessfully exhausted their internal plan remedies. Alabama, Georgia, and Florida have not seen fit to take advantage of this means for escaping *Bruch*.  Meanwhile, the Eleventh Circuit has created its "six-step" analysis, which puts plan administrators and insurers firmly in the driver's seat, and invites them to sit in judgment on their own denial decisions, and to ignore, as if meaningless, their fiduciary obligations of strict loyalty to their plan beneficiaries.

### So, What About the Above-Captioned Case?

Plaintiff, Karen Criss ("Criss" or "plaintiff"), brings this action seeking benefits she claims are owed her under a long-term disability insurance plan provided by her employer, HeartSouth Cardiovascular Group ("HeartSouth"), and insured by defendant, Union Security Insurance Company ("Union Security" or "defendant"). Before the court are cross-motions for summary judgment[1] and supporting memoranda.  This court has in earlier opinions made known its belief that Rule 56 does not fit ERISA cases as long as *Bruch* provides the method for review, but this court "goes along to get along."

---

[1]Defendant's motion is styled as a "motion for judgment on the pleadings."  (Doc. 15).  Because defendant relies on materials outside the pleadings, the court construes the motion as a motion for summary judgment.  *See* Fed. R. Civ. Pro. 12(c)-(d).

**Factual Background**

Plaintiff is 57 years old.  From January, 2003 to February, 2008, she worked as a financial clerk for HeartSouth.  R. at 139. As part of her employment package, she was insured under the disability insurance policy that is at issue in the instant action and that covered physicians, administrators, and clerks.  *Id.*

As early as 1993, Criss was diagnosed with fibromyalgia, a disorder of unknown cause that causes widespread and severe pain, fatigue, sleep loss, and mood swings. R. at 502.  Criss's medical records deal mostly with treatment she received after 2006.  These records reflect that she saw no fewer than six doctors in 2006 and 2007 for her fibromyalgia and other medical conditions, including neuropathy (a disease similar to fibromyalgia that involves general pain and weakness in the extremities).  The doctors achieved only partial success in treating Criss's various ailments by increasing or reducing her medications.  *See, e.g.*, R. at 1107.  A November, 2007 doctor's report noted that "[s]he has quit all vitamins, anti-depressants, Synthroid in the last 3 weeks and now 'I feel better than I have before'".  *Id.*  But, her above-mentioned symptoms were never eliminated or ameliorated to the point of a release from pain or from treatment.

On an afternoon in February, 2008, Criss suddenly left work in the middle of the day in what would turn out to be a permanent

departure.  A claims agent for Union Security interviewed her in the following month and summarized what she found as follows:

> There was an incident and build up of exhausting her self [sic] at work, new computer system at work, not sufficient training, they had to stop what they were doing, go out to the internet and get the training as they needed, she couldn't get the training she needed, "hands on" kind of person, she couldn't understand these foreigner people that she couldn't understand, she had deadlines, she had a panic attack, she felt she was going to explode, she ran into her bosses [sic] office, she told the boss she had to go and she ran out of the building.

R. at 1090.  Criss tried to return to work, but upon doing so, she had "panic attacks, [would] break out in hot sweat, her chest [would have a] screw where the screwdriver keeps tightening it up to about 100 pound weight, [and] she [would have] palpitations . . . ."  *Id.*

In the wake of what can only be described as a nervous breakdown, Criss continued to see her treating doctors, and added a host of new doctors, both for treatment and for evaluation of her possible disability status.  These medical consultations included partial hospitalization in an "Intensive Outpatient Program," during which she was treated for "major depression, panic attacks and work stress."  R. at 1016.  She continued to receive treatment for her pain-related illnesses such as fibromyalgia and neuropathy.  *See, e.g.,* R. at 779-80 (April 2008 treatment notes indicating "very symptomatic" fibromyalgia).

Criss filed her disability claim with Union Security in April, 2008, citing "anxiety, panic disorder, depression, **severe pain**, **fibromyalgia**, **neuropathy**, [and] **carpal tunnel**." R. at 1096 (emphasis added). Defendant happily approved the claim, and began paying Criss benefits. R. at 165-69. However, defendant explained in its approval letter that Criss was required to file a disability claim with the Social Security Administration ("SSA"), so that defendant could offset its payments to Criss by any amounts awarded by the SSA. R. at 166. Criss complied with defendant's demand, and the SSA granted her application for benefits in May, 2009, R. at 940-41, whereupon Criss refunded to defendant a significant amount of money, R. at 916-17.

In 2010, defendant cut off plaintiff's benefits. In accordance with the plan's procedures, Criss appealed defendant's decision. Defendant finally denied Criss's appeal on November 30, 2010. R. at 470-76. It is this denial that plaintiff challenges in the above-styled quasi-administrative proceeding.

**The Six-Part Test**

The first step in the Eleventh Circuit's super-unique six-step test requires the court to apply "the *de novo* standard to determine whether the claim administrator's benefits-denial decision is 'wrong' (i.e., the court disagrees with the administrator's decision)". *Blankenship v. MetLife* Ins. Co., 644 F.3d 1350, 1355 (11th Cir. 2011). Only if the court determines that the decision

8

was *de novo* correct does the court go to "step two", or beyond. This court is stymied, finding it impossible to make the determination required by "step one", because the record does not provide evidence upon which this court can reasonably and fairly reach a *de novo* decision.

**Procedural Correctness Required**

No matter whether it is ultimately determined that defendant's denial decision was "correct", that determination can come only after the plan administrator has fulfilled the "fundamental requirement that [its] decision to deny benefits [is] based on **a complete administrative record that is the product of a fair claim-evaluation process.**" *Melech v. Life Ins. Co. of N. Am.*, 739 F.3d 663, 676 (11th Cir. 2014) (emphasis added). Thus, if Union Security, the plan administrator, has made a decision without a complete administrative record, or without a fair claim-evaluation process, "**the proper course of action [for a court] is to remand [to the plan administrator].**" *Id.* at 675 (emphasis added).

This court detects at least two procedural shortcomings that require a remand of this dispute to the plan administrator as required by *Melech*.

**I**

**Drawing the Line Between Disabling**
**Physical Ailments and a Disabling**
**Combination of Physical and Mental Ailments**

The following plan language is crucial to a resolution of this dispute:

> We pay only a limited benefit for a period of disability due to alcoholism, drug addiction, chemical dependency and **mental illness**.  The Maximum Benefit Period for all such periods of disability is 24 months. . . .
>
> Your period of disability will be considered due to alcoholism, drug addiction, chemical dependency or mental illness if:
>
> **- you are limited by one or more of the stated conditions; and**
> **- you do not have other conditions which, in the absence of the stated conditions, would continue to exist, limit your activities, and lead us to conclude that you were disabled.**

R. at 24 (emphasis added).  This language, drafted by defendant, creates a very difficult fact-finding regime.  Whether the fact-finder is the structurally conflicted payor, or is this court upon *de novo* consideration (as required by "step one"), the inquiry is whether plaintiff's serious **physical** problems, divorced from her **mental** problems that are largely symptomatic of her physical problems, render her unemployable.  The parties did not recognize or adequately address this factual and semantic problem, either during Criss's 24-month period of mental illness, during which plaintiff was admittedly entitled to disability benefits, or thereafter.

10

It does not take the dean of Johns Hopkins School of Medicine to know that there is a link between the functioning of the human brain and the well-being of the rest of the body, although that connection is not easy to explain or describe. Any person who is in constant pain becomes, at least to some extent, "anxious" (the word from which the word "anxiety" derives). An overly anxious person has a mental problem. In circumstances involving a myriad of medical problems like those in this case, it may be impossible to draw the line contemplated by this policy language. No physician, with the possible exception of the hereinafter mentioned Dr. Fleeson, has been asked a question that elicits his opinion as to whether he has the tools to even answer the ultimate question, and, if so, to give the right answer. The ultimate question of whether Criss's physical ailments alone disabled her becomes close to being an academic, theoretical, hypothetical question. Plaintiff, who has never been called a charlatan, obviously believes that her physical ailments alone act to prevent her from working at any job, sedentary or not. Except for Dr. Fleeson, the doctor who was hired by defendant during Criss's first appeal, nobody has attempted to distinguish the period of time, if any, during which plaintiff's physical disabilities alone rendered her "disabled", and the period during which a combination of her mental and physical disabilities rendered her "disabled". Dr. Fleeson concluded that for 38 days during the 24 months of plaintiff's

11

conceded mental illness, she was so **physically** disabled that she
was "disabled", without regard to the fact that she was at the same
time **mentally** disabled.   The court expressly asked counsel for
defendant to explain Dr. Fleeson's rationale for this conclusion.
In response to the court's inquiry, defendant undertook to explain
these 38 days as follows:

> *Certain acute conditions constituted a separate
> disability for a limited period of time.*
>
> During the first appeal, Union Security obtained an
> independent medical review from William P. Fleeson, M.D.,
> M.P.H. (US000529-US000556).   During that review, Dr.
> Fleeson identified a total of 38 days during which he
> believed Plaintiff would have been physically disabled
> from sedentary work due to three different acute
> conditions:  (1) 14 days for carpal tunnel syndrome in
> September 2008; (2) 21 days for thoracic and lumbar spine
> degenerative disc disease in July and August 2008; and
> (3) 3 days for shoulder impingement syndrome in January
> 2009.  (US000540-41, US000544).  Dr. Fleeson based these
> determinations on his evaluation of the medical records
> and by referencing *The Medical Disability Advisor*, which
> Dr. Fleeson states is a nationally-recognized and peer-
> reviewed authority on medical conditions and their
> associated recovery period and time away from work.
> (US000539).
>
> Based on Dr. Fleeson's finding of 38 days of complete
> disability due to physical conditions, Union Security
> paid Plaintiff an additional 38 days of disability
> benefits.   The 24-month mental illness limitation does
> not apply to any periods in which Plaintiff also was
> completely disabled due to physical conditions.
> Therefore, the 24 month limitation did not apply to the
> prior 38 days in which Union Security found that
> Plaintiff was physically disabled.   Accordingly,
> Plaintiff's benefits period was extended by 38 days, from
> May 27, 2010 through July 4, 2010.  (US000517).

Apparently Dr. Fleeson was specifically asked to employ the policy language as to whether Criss had any "other conditions which, in the absence of the stated condition [mental illness], would . . . limit [her] activities and lead us to conclude that [she was] disabled". He apparently understood the importance of this policy language. No other physician, whether hired by defendant or hired by plaintiff, has been asked, much less attempted to answer, this question.

Dr. Fleeson, whose credibility is in question, discounts and downplays Criss's "fibromyalgia" and "neuropathy" as non-acute conditions, apparently unlike "carpal tunnel," or "spine degenerative disease", or "shoulder impingement", which, in and of themselves, or in combination, according to him, rendered Criss totally unemployable. The record does not reflect whether Criss still has carpal tunnel, and/or degeneration of her thoracic and lumber discs, and/or shoulder impingement. Has she totally recovered from these "acute", disabling physical ailments? Neither a non-treating physician, nor a treating physician, nor a vocational expert has provided opinion evidence upon which this court, as a *de novo* fact-finder, can conclude that a 57-year-old woman with severe fibromyalgia and neuropathy, carpal tunnel, degenerative disc disease and shoulder impingement, can find gainful employment and fulfill the duties of an available job. Incidentally, while Dr. Fleeson was discussing the clinical

presentation of fibromyalgia, he noted that "[a]t least 17 other medical and **psychiatric** conditions have considerable clinical and symptomatic overlap with [**fibromyalgia**]."  R. at 542 (emphasis added).  In other words, even Dr. Fleeson may find it difficult to draw a line between fibromyalgia and mental illness.  According to him, one may imply the other.  Is this a Catch-22?

<u>**II**</u>

**<u>Do Plaintiff's Physical Problems Alone Meet
the Plan's Definition of "Disability"?</u>**

Central to this or to any other ERISA disability claim is the plan's definition of "disability".  The court has already discussed that portion of Union Security's insurance policy that would preclude liability for "mental illness" after 24 months.  The terms of this policy that define "disability" are complicated, but understanding them is necessary to a decision.  The pertinent language is as follows:

**<u>DEFINITIONS FOR LONG TERM DISABILITY INSURANCE</u>**

**\* \* \* \* \***

*Disability* or *disabled* means that **in a particular month, you satisfy one or more of the three Tests, as described below.**

**\* \* \* \* \***

Occupation Test (For each All other Employees)

- during the first 24 months of a *period of disability* (including the *qualifying period*), an *injury*, sickness, or pregnancy requires

14

that you be under the *regular care and attendance* of a doctor, and prevents you from performing at least one of the *material duties* of your *regular occupation*; and

- after 24 months of *disability*, an *injury*, sickness, or pregnancy **prevents you from performing at least one of the *material duties* of each *gainful* occupation for which your education, training, and experience qualifies you.**

If during the first 24 months of a *period of disability* (including the *qualifying period*), you can perform the *material duties* of your *regular occupation* with *reasonable accommodation(s)*, you will not be considered *disabled*. **If, after 24 months of a *period of disability*, you can perform a *gainful occupation* for which your education, training, and experience qualifies you, with *reasonable accommodation(s)*, you will not be considered *disabled*.** The inability to perform a *material duty* because of the discontinuance of *reasonable accommodation(s)* on the part of the employer does not, in itself, constitute *disability*.

* * * * *

*Gainful occupation* means an *occupation* in which you could reasonably be expected to earn at least as much as your Schedule Amount within 12 months of your return to work.

* * * * *

**Schedule Amount:** 60% of *monthly pay* subject to a maximum Schedule Amount of $15,000 per month, except as stated in Proof of Loss provision.

(italics in original, bolding added).  R. at 5-7.

This language raises the following questions, as yet unanswered:

(1)  Assuming with Dr. Fleeson "that in a particular month" (in fact, four months, September of 2008, July of 2008, August of

15

2008, and January of 2009), Criss satisfied one of Union Security's tests, without regard to her mental condition, was she "disabled" for each of those entire four months or just for the few days found by Dr. Fleeson?

(2)  Does *contra proferentem* apply to assist in the resolution of the ambiguities in this plan language?  *See White v. Coca-Cola Co.*, 542 F.3d 848 (11th Cir. 2008).

(3)  After the first 24 months expired, did any of Criss's "sicknesses" prevent her from performing a "gainful occupation" for which her "education, training and experience" qualified her?

(4)  What was Criss's education, training and experience?

(5)  Can Criss perform any occupation for which she could reasonably expect to earn "at least as much as [her] Schedule Amount within 12 months of [her] return to work" when Criss is not returning to work?

(6)  What was Criss's salary when she was working?

(7)  What is the job market for a 57-year-old woman with severe pain, fibromyalgia, neuropathy, carpal tunnel, disc disease, and shoulder impingement?

(8)  Can witnesses other than Dr. Fleeson, including Criss herself, express opinions as to what particular days in what particular months Criss was totally disabled by physical ailments divorced from mental illness?

16

Despite the fact that the Eleventh Circuit routinely gives plan administrators the benefit of the doubt, the Eleventh Circuit is literally the leader in recognizing that a disability claimant does not have to be a blind paraplegic in order to be "disabled" within the meaning of that word in a benefits plan. The totality of circumstances must be considered. In *Helms v. Monsanto Co., Inc.*, 728 F.2d 1416 (11th Cir. 1984), the Eleventh Circuit addressed the question which at that time was one of first impression. What the Eleventh Circuit there held deserves a quotation at length:

> Dr. Skalka's deposition was taken in November, 1982, in preparation for trial. He was asked by appellant's counsel to explain his reasoning as to why he concluded that Mr. Helms was not totally and permanently disabled. He responded:
>
> Well, I felt that Mr. Helms was certainly disabled, but, according to that definition, with that word, 'any occupation or employment for remuneration or profit,' I really couldn't think of any disability compatible with conscious life that would allow me to say anybody was 'disabled within the definition set out above,' so I had to sign it, 'Not disabled within the definition.'
>
> Skalka's Deposition at 21-22.
>
> The district court concluded that Dr. Skalka did not act arbitrarily and capriciously in reaching his decision and therefore Monsanto had properly denied Mr. Helms the benefits. The sole issue before this court is whether the arbitrator was arbitrary and capricious in finding that appellant was not disabled because permanent total disability is inconsistent with conscious human life. We find that the arbitrator applied the wrong standard to determine permanent total disability and therefore reverse and remand for further proceedings consistent with this opinion.

17

\* \* \* \* \*

There is no particular provision in ERISA nor could we find any federal case which specifically dealt with the issue presented here.  However, under ERISA's legislative scheme, this court is empowered to formulate rules of law to govern various aspects of the employee benefit field.  As Congress pointed out, "[I]t is also intended that a body of law will be developed by the courts to deal with issues involving rights and obligations under private welfare and pension plans."  120 Cong.Rec. 515, 751 (daily ed. August 22, 1974).  Yet, in formulating these laws courts must be guided by the general policies underlying ERISA.  The general objective of this Act is to increase the number of individuals in employer-financed benefit plans.  Congress wanted to assure that those who participate in the plans actually receive the benefits they are entitled to and do not lose these as a result of unduly restrictive provisions or lack of sufficient funds.  H.R.Rep. No. 93-807, 93rd Cong., 2nd Sess. 3, *reprinted in* 1974 U.S. Code Cong. & Ad.News 4639, 4670, 4676-77.

Total disability under this type of provision is not considered to exist if the insured can follow any remunerative occupation, whether in his present vocation or another.  **The phrase should not be given an absolute and literal interpretation.  It should not mean that the affected individual must be utterly helpless to be considered disabled.  It must be a relative term which means that the individual is unable to engage in a remunerative occupation or to do work in some profitable employment or enterprise.  Permanent disability is a question of fact that depends upon all the circumstances of a particular case.**  Bearing in mind, we turn to the arbitrator's construction of the clause in this case.

Dr. Skalka's decision must be upheld on review unless it is arbitrary and capricious. (citations omitted).  Dr. Skalka's interpretation of the DIP was arbitrary and capricious.  By his own words, a finding of permanent disability would only be possible if the individual had no "conscious life."  Such a standard would render the entire Monsanto DIP totally meaningless.  Recognizing this is a difficult area, we will set forth the appropriate standard.

In order to determine when a Monsanto employee will be considered to be totally and permanently disabled under the provisions of the DIP we must define the phrase any occupation or employment for remuneration or profit." It is difficult to do this because a person would almost never be deprived of the ability to earn a nominal sum unless he is rendered completely immobile and without cognitive ability.  In order to establish a reasonable interpretation of this phrase we turned for guidance to insurance policies with similar provisions and to cases construing the Social Security disability provisions.

Analogous insurance cases consistently agree that the term "total disability" does not mean absolute helplessness on the part of the insured.  **The insured can recover benefits if he is unable to perform all the substantial and material acts necessary to the prosecution of some gainful business or occupation.** Gainful has been defined by these courts as profitable, advantageous or lucrative.  Therefore, the remuneration must be something reasonably substantial rather than a mere nominal profit.  (citations omitted).

* * * * *

Common knowledge of the occupations in the lives of men and women teach us that there is scarcely any kind of disability that prevents them from following some vocation or other, except in cases of complete mental incapacity.  Although the achievements of disabled persons have been remarkable, we will not adopt a strict, literal construction of such a provision which would deny benefits to the disabled if he should engage in some **minimal occupation, such as selling peanuts or pencils, which would yield on a pittance.  The insured is not to be deemed "able" merely because it is shown that he could perform some task.**

Neither will we adopt the definition used by the arbitrator in this case.  He believed that anyone alive and conscious would not qualify for benefits under the Monsanto plan.  The word disability is not ordinarily used to describe death, although death is undeniably the ultimate disability.

To bar recovery, under the provisions of the DIP, the earnings possible must approach the dignity of a

> livelihood.   Mr. Helms is required to show physical
> inability to follow any occupation from which he could
> earn a reasonably substantial income rising to the
> dignity of a income or livelihood, even though the income
> is not as much as he earned before the disability. *See,*
> *e.g., Mutual Life Ins. Co. v. Bryant*, 296 Ky. 815, 177
> S.W..2d 588 (1943).  The arbitrator in this case applied
> the wrong standard.  We reverse and remand so that the
> arbitrator can allow development of all appropriate
> evidence for consideration under the correct standard.

*Id.* at 1419-22 (emphasis added).

Other courts have taken up the Eleventh Circuit's theme.  In
*Torix v. Ball Corp.*, 862 F.2d 1428, 1429 (10th Cir. 1988), the
Tenth Circuit responded to a plaintiff's argument that the ERISA
plan decision-makers had acted arbitrarily and capriciously in
determining that he was not totally disabled, without "taking into
account his age, limited educational background, and the
unavailability of suitable employment in the area."  The Tenth
Circuit responded as follows:

> We believe that the policy concerns which underlie ERISA
> would be severely undermined if we endorsed a literal
> reading of the plan's terms.  Thus **we join the reasoning**
> **of the Eleventh Circuit** and hold that a reasonable
> interpretation of a claimant's entitlement to payments
> based on a claims of "total disability" must consider the
> claimant's ability to pursue gainful employment in light
> of all the circumstances.

*Id.* (emphasis added).  In *Demirovic v. Building Service 32 B-J*
*Pension Fund*, 467 F.3d 208, 212-13 (2nd Cir. 2006), the Second
Circuit found:

> [T]he Fund's Review of Demirovic's claim suffers from a
> more fundamental flaw.  The Fund's determination that
> Demirovic is *physically* capable of performing some kind

> of sedentary work may be supported by substantial
> evidence; but the Fund appears to have given no
> consideration whatsoever to whether Demirovic could, in
> fact, find such sedentary work.

The Second Circuit cited *Helms* in support of this proposition, which makes overwhelmingly good sense.

If there is evidence in this record upon which an unbiased arbiter can find that a 57-year-old female, with all of the physical ailments described by her treating physicians, can expect to obtain gainful employment, particularly employment in which she can "reasonably be expected to earn at least as much as her Schedule Amount", this court has not been able to find it.   In today's job market, employers are not eager to hire sedentary workers 57 years of age who are in pain and have pervasive physical ailments.

### Remand

This case is peculiarly appropriate for mediation.   In light of the foregoing, **unless within two (2)** weeks, the parties agree to mediation in accordance with this court's Alternative Dispute Resolution Plan, the court will remand the dispute to the plan administrator, who will be charged with obtaining answers to the questions hereinabove outlined, and who shall provide a full and fair administrative review.   **All witnesses shall be furnished a copy of this opinion**.   The court shall expect this new review to be completed and a final decision rendered **within ninety (90) days**.

21

DONE this 11th day of June, 2014.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE